UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
REIGN BLUE CORP.,

                            Plaintiff,

       -against-

GATEWAY COMMERCIAL FINANCE, LLC
and ROSS STORES, INC.,
                            Defendants.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
CV 13-3915 (JS)(WDW)

**WALL, Magistrate Judge:**

Before the Court, on referral from District Judge Seybert, is plaintiff's motion for a preliminary injunction. *See* Docket Entry ("DE") [5]. According to plaintiff Reign Blue Corp. ("Reign Blue"), defendant Gateway Commercial Finance, LLC ("Gateway") filed an improper and unauthorized UCC-1 statement against Reign Blue, resulting in the cancellation of purchase orders and the inability of Reign Blue to obtain credit and continue operations. Plaintiff further claims that defendant Ross Stores, Inc. ("Ross") holds monies owed to Reign Blue that it is not releasing due to the existence of the UCC-1 statement. In its motion for a preliminary injunction, Reign Blue seeks an order: "(a) terminating the UCC-1 statement filed by Defendant Gateway Commercial Finance, LLC naming Plaintiff Reign Blue Corp as debtor; and (b) directing Defendant Ross Stores, Inc. to release all money it is withholding from Reign Blue Corp. due to the UCC-1 filing." Order to Show Cause, DE [5].

The court conducted a hearing on the motion on August 9, 2013. Plaintiff's principal, Alex Yoon, gave testimony, as did independent salesperson Gary Nadelman and defendant Gateway's principal, Marc Marin. The parties sought, and were given permission, to submit post-hearing briefs. Based on the evidence presented at the hearing and the papers submitted by

both parties, the undersigned respectfully recommends that plaintiff's motion be DENIED.

## FACTUAL BACKGROUND

The facts cited are taken from the Complaint, the papers submitted by the parties, and the record of the hearing held on August 9, 2013. Plaintiff is a New York corporation engaged in the business of importing ladies garments and distributing the garments to domestic retail stores. Compl. ¶¶ 1, 12. Defendant Ross is a retail store that had entered into agreements to purchase garments from Reign Blue. ¶¶ 2, 14. On or around June 28, 2013, Reign Blue learned that Ross was withholding payments of monies due and owing to it because of a UCC-1 statement filed in New York against Reign Blue by defendant Gateway. ¶ 2. Gateway did not have a relationship with Reign Blue, but rather alleges that Reign Blue was a successor company to non-party SB Max Global, Inc. ("SB Max"). ¶ 4. Plaintiff claims that it has no relationship with SB Max other than a sublease of office space and that Gateway's UCC-1 filing is improper and unauthorized. ¶ 5. Reign Blue and Gateway stipulated that they have received information from Ross's counsel that Ross is holding either $211,000 or $227,000 in monies due from Ross to Reign Blue. Transcript of 8/9/2013 Hearing ("Tr.") 49.

**Gateway's Relationship with SB Max**

Gateway, as a factoring company, buys commercial accounts receivable from other businesses. Tr. 115. According to Marin, he communicated with SB Max through Hwung Hong, the husband of Russell Lee, president of SB Max. Tr. 115. As a result, Gateway and SB Max entered into a Master Purchase and Sales Agreement dated May 1, 2012. Tr. 116; Def.'s Ex. J. The agreement was signed by Marin and Lee.

At the inception of the business relationship between Gateway and SB Max, several e-

mails were exchanged regarding SB Max's relationship with a Guatemalan factory run by Beltlan, S.A. Gateway received communications from Lux Hwang, signing as Vice President of SB Max Global Corp., in which he indicated that Beltlan "is my parent company" and referred to Sewon Beltlan as "[m]y parent company." Def. Ex. Q. Another e-mail in July 2012, from a James Yun with a sewonbeltlan.com e-mail address, states that "SB Max Global and Beltlan, S.A. are the same company." Def. Ex. Q. Marin believed that the relationships between SB Max, Beltlan, and Sewon International were "not arm's length" and that the Guatemalan companies used SB Max as their "marketing arm." Tr. 122, 123.

After a period of time, SB Max asked if Gateway could provide purchase order, or "PO," financing. Tr. 117. Under such an arrangement, Gateway would pay for the goods to be produced prior to an invoice being generated. Tr. 117. As the goods have yet to be delivered, such an arrangement is riskier to the financing company. Tr. 117. Based on its prior dealings with SB Max and with Ross, and the factory's "consistent history of providing goods to Ross," Gateway agreed to provide PO financing to SB Max. Tr. 117, 123. Gateway and SB Max entered into a Purchase Order Addendum & Security Agreement dated November 12, 2012 and a Purchase Order Addendum dated December 12, 2012. Def. Ex. K, L. Both agreements were signed by Marin and Lee on behalf of Gateway and SB Max, respectively.

In February 2013, Gateway and SB Max amended the Master Purchase and Sales Agreement, wherein Gateway agreed to "increase [SB Max's] credit facility and lower the fees and extend the term of the relationship." Tr. 119; Ex. M. Marin estimated that for Gateway's 2013 and 2014 budgets, SB Max's business represented 15 to 20 percent of Gateway's gross purchases and 30 percent of its revenue. Tr. 124.

3

**Inception of Reign Blue**

Reign Blue filed a Certificate of Incorporation in New York state on March 16, 2012. Pl. Ex. 2. According to its corporate resolutions dated April 21, 2012, Alex Yoon is the President, Director, and lone shareholder of Reign Blue. Pl. Ex. 3. The address on the Certificate of Incorporation is 15-58 127th Street, College Point, New York 11356 (the "College Point address"). Pl. Ex. 1. According to Yoon, he "borrowed" this address from Russell Lee, the owner of SB Max. Tr. 10. Yoon, who was introduced to Ms. Lee by a mutual friend, met her for the first time in February 2012. Tr. 10-11.

Yoon testified that Reign Blue opened for business immediately in March 2012, but acknowledged that it did not purchase product and had neither customers nor employees at that time. Tr. 11-12. Reign Blue's first sale occurred in April 2013. Tr. 12. According to Yoon, he spent the year between Reign Blue's incorporation and its first sale "traveling in Asia, including Korea, China and Vietnam, to search for an appropriate factory." Tr. 12. This search was not successful. Tr. 12. In an affidavit, Yoon states that "[e]ventually, I was introduced to a clothing factory in Guatemala operated by a large Korean-owned company named Beltlan, S.A." and that he "found Beltlan to be suitable for Reign Blue's needs." Yoon Decl. ¶13, DE [5]. No evidence was introduced regarding when this introduction took place or who made it.

Yoon was looking for a place to operate his business and called Lee, the president of SB Max, who, on March 5, 2013, sublet office space located at 1 Enterprise Pl., Suite 1F, Hicksville, New York 11801 (the "Hicksville address") to Reign Blue. Tr. 17; Pl. Ex. 7. The one-page Sublease Agreement was signed by Yoon on behalf of Reign Blue and by Lee on behalf of SB Max. The term of the lease is for one year, and Reign Blue agreed to pay monthly rent in the

amount of $2,300.00 plus 50% of the utilities.  Yoon was unable to name the landlord for the property despite the Sublease Agreement's statement that he acknowledged receipt of the lease.  Tr. 69-70.  In addition to one room, Reign Blue uses part of the warehouse as needed.  Tr. 57.  Reign Blue carries no insurance for the business or the goods stored.  Tr. 69.

Within days after entering into the sublease with SB Max, Reign Blue entered into a financing agreement with a Korean company named Michelle Kookje Corporation ("Michelle").  Compl. ¶19.  The Joint Business Agreement dated March 8, 2013 indicates that Reign Blue's place of business is the Hicksville address.   Pl. Ex. 6.

Reign Blue's first sale was dated April 4, 2013 and was made to BNS & Partners, described by Yoon as a "company in Manhattan that sells clothing."  Tr. 21; Pl. Ex. 8.  This purchase order for $11,550.00 was fulfilled and Reign Blue was paid.  Tr. 22.  This is the only documentary evidence of any sale made by Reign Blue to a company other than Ross.  Yoon did testify regarding another customer, Nara, that has ordered a total of $3,000 to $5,000 worth of goods.  Tr. 50-51.

Reign Blue did not move into the Hicksville address until approximately May 5, 2013.  Tr. 18.  A photograph of the entry to the Hicksville address shows a single, integrated sign with a red logo, next line "SB MAX GLOBAL Corp.[,]" next line "REIGN BLUE Corp.[,]" and then a single phone number and e-mail address – "(516) 433-1599 – SEWONGLOBAL.COM."  Def. Ex. F.   Reign Blue's first bank account was opened in April or May 2013.  Tr. 68; Pl. Ex. 4.

**Events Leading to this Litigation**

<u>Gateway's Connection with 2 Ross Purchase Orders</u>

In March 2013, two Ross purchase orders central to this litigation were issued.  One

5

order, number 5706955 ("PO '955") was dated March 7, 2013 and showed SB Max as the vendor. Ex. I. A second Ross Purchase Order numbered 5709731 (" PO '731") was dated March 11, 2013 and also showed SB Max to be the vendor. Ex. I. On March 29, 2013, Gateway made a payment of $64,466.90 to PCA Textiles, a broker of fabric, on behalf of SB Max, for materials to be used to satisfy the Ross purchase orders. Tr. 125-26; Def. Ex. I. Those materials were shipped directly to Guatemala. Ex. I. On March 29th, the day Gateway paid for the materials, Marin of Gateway had an e-mail exchange with James Yun at Beltlan regarding the completion of PO '731. Tr. 125; Ex. I. Yun indicated that PO '731 was "ready to ship now" but was on "hold by Ross for a while due to thier [sic] sales situation." E-mail of 3/29/13, Ex. I.

Reign Blue's Assumption of the Ross Purchase Orders

Gary Nadelman is an independent sales representative who represents importers on products and sells them to stores including Ross. Tr. 81. Nadelman worked with SB Max until April 2013. Tr. 82. Nadelman learned from some unspecified person at the Guatemala factory that SB Max had money problems, that it was unable to pay for the manufacture of an order of product for Ross, and that someone was needed to finance the garments set to be shipped to Ross. Tr. 83. At this point, two Ross purchase orders needed to be filled, but Ross wanted to give Nadelman additional orders for future months. Tr. 84.

According to Nadelman, someone at the factory "found" Reign Blue and told Nadelman to call Alex Yoon. Tr. 83. Nadelman asked Yoon if he was willing to finance the outstanding Ross purchase orders as well as future business. Tr. 83. According to Yoon, Nadelman told him that there was a "really nice order" canceled from another company that Yoon could take if he had financing. Tr. 22-23. Yoon agreed to get financing from Korea. Tr. 85. These

6

conversations took place some time in April 2013. Tr. 23; 83.

Eight purchase orders from Ross were issued with Reign Blue as the vendor. Pl. Ex. 9.[1] Of the orders given to Reign Blue, two were identified as canceled orders that had previously been issued to SB Max. Tr. 24-25. Ross Purchase Order 5741429 ("PO '429") is dated April 18, 2013 and Ross Purchase Order 5750500 ("PO '500") is dated April 29, 2013; both orders designated Reign Blue as the vendor. Pl. Ex. 9, pp. 1, 7. Nadelman further indicated in an e-mail dated April 24, 2013, that PO '955 "was cancelled by my buyer, Shara Furman, and was rewritten under PO # ['429']." Def. Ex. O. The entirety of the testimony and documents shows that the original PO '955 with SB Max as the vendor was canceled and rewritten as PO '429 with Reign Blue as the vendor.

On April 30, 2013, Reign Blue placed an order with Beltlan to satisfy POs '429 and '500 and ship them to Ross. Pl. Ex. 10, p. 4. Plaintiff also introduced evidence that on May 3, 2013, Yoon, by fax, directed Reign Blue's financier, Michelle, to wire funds to Beltlan to cover various invoices, including $70,800.00 for PO '429 and '500. Pl. Ex. 11. An additional fax dated May 16, 2013 indicates that the payment was made. Pl. Ex. 12. Ross issued three additional purchase orders with Reign Blue as the vendor in May 2013. Tr. 34-35; Pl. Ex. 13. Those orders were filled, but Ross has withheld payment because of the UCC-1 filed by Gateway.

<u>Gateway Learns of Reign Blue, Investigates, and Files the UCC-1</u>

In March 2013, customary communication between Gateway and SB Max essentially stopped. Tr. 127. Initially, Lux Hwang advised Marin that his son had been hospitalized and

---

[1]Although the testimony cites eight purchase orders, plaintiff's Exhibit 9 comprises nine purchase orders.

that was the reason for the communication breakdown, an explanation that Marin accepted. Tr. 127-28. In May 2013, Gateway came to believe that the Beltlan factory was having cash flow issues. Tr. 118. In an e-mail exchange dated May 7, 2013, Marin asked for an update on PO '731 and PO '955 and was advised that "[d]ue to delay of the trims by difficult cash flow, those p.o.s are still in process of sewing." Def. Ex. I. As was discussed *supra,* there is evidence that PO '955 had already been canceled and re-written as early as April 24, 2013. Def. Ex. O.

Marin first became aware of the existence of Reign Blue at the end of April 2013. Tr. 127. Nadelman's April 24th e-mail regarding the cancellation of PO '955 was sent to Barbara Scott at Gateway. Def. Ex. O. Gateway tried to establish contact with SB Max, using phone numbers in its files, and "attempted to send e-mails and faxes to provoke a response" but none was forthcoming. Tr. 128. Marin then attempted to "find out who Reign Blue was." Tr. 128. Gateway used numerous search techniques, but could not locate a telephone number for Reign Blue. Tr. 128.

At this point, Gateway looked for and discovered Reign Blue through the Secretary of State in New York. Tr. 129. They were able to identify the name Alex Yoon, but did not recognize it. Tr. 129. Gateway was able to determine, and the documentary evidence confirms, that Reign Blue used the same principal address as SB Max,[2] that the articles of incorporation for Reign Blue and SB Max were almost identical, and that the same incorporator was used to form both corporations. Tr. 129; Def. Ex. C & D.

---

[2] SB Max's original address in New York, NY was changed to 15-58 127th Street, College Point, NY by Certificate of Change of the Certificate of Incorporation dated March 15, 2012 and prepared by John Park. Def. Ex. D. Reign Blue's Certificate of Incorporation using the same address was also prepared by Park and dated March 15, 2012. Def. Ex. C.

Marin learned from a contact in Ross's accounts payable department that two purchase orders issued to SB Max had been canceled and reissued to Reign Blue. Tr. 130. Marin reached out to the buyer, Shara Furman, who confirmed by e-mail dated June 13, 2013 that PO '955 and '429 had been replaced with '429 and '500, and that the goods had been received. Def. Ex. H. Marin believed that the advances that Gateway had made on the SB Max purchase orders had been converted to Reign Blue, and he concluded that Reign Blue was a successor company to SB Max. Tr. 131. Marin also felt that SB Max's customer lists were part of Gateway's collateral. Tr. 131-32.

On June 13, 2013, Gateway filed a UCC-1 statement against Reign Blue. Pl. Ex. 15. Since Reign Blue entered the picture, Marin has had no communication with SB Max or any of its representatives. Tr. 128. Marin became concerned that SB Max was defunct and that there would be no recovery from that entity. Tr. 133. In addition, he believed that "if, in fact, Ross was holding moneys due to Reign Blue, that it might be my only source for repayment. Therefore I felt justified at that point to file my UCC." Tr. 134. Marin considers Reign Blue to be a marketing arm of the Guatemalan factory Beltlan. Tr. 135. Marin testified that he has never been contacted by anyone from Michelle about its competing interest in Reign Blue assets, nor has Michelle filed its own UCC-1 to his knowledge. Tr. 137-38.

Yoon learned about the UCC-1 from Rebecca in the legal department at Ross. Tr. 36. He also received an e-mail on June 21, 2013 from Ross indicating that Reign Blue's account was on hold. Pl. Ex. 14. He claims that Ross canceled orders and has withheld payments, and that Michelle has ceased its financing due to the UCC-1. Tr. 36-37.

The parties engaged in some pre-litigation discussions in an attempt to resolve the issues,

9

but were unsuccessful. Plaintiff filed its complaint on July 12, 2013. DE [1]. On July 17, 2013, plaintiff filed the instant motion. DE [5]. Judge Seybert entered an order to show cause on July 23, 2013 and set a hearing on the motion for July 30, 2013. DE [8]. Only July 25, 2013, Judge Seybert referred the motion to the undersigned. DE [9]. After Gateway filed a motion to adjourn the July 30 hearing, a telephone conference before the undersigned was held on July 29, 2013 to determine the status of the motion. Electronic Order dated July 26, 2013. At the July 29 conference, I adjourned the hearing scheduled for July 30, 2013 to allow the parties to engage in settlement discussions and directed the parties to appear at a telephonic status conference on August 2, 2013. DE [13]. Gateway and Reign Blue were unable to reach a settlement, so a preliminary injunction hearing was scheduled and held on August 9, 2013. DE [19].

## DISCUSSION

### I. Preliminary Injunction Standard

To obtain a preliminary injunction, a plaintiff "must demonstrate (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Christian Louboutin S.A. v. Yves Saint Laurent American Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) (internal quotations and citations omitted). "Such relief, however, 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consolidated Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Ultimately, the decision to grant or deny this "drastic" remedy rests in the district court's sound discretion. *See American Exp. Financial Advisors, Inc.*

*v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998).

In addition, where a preliminary injunction is sought to change the *status quo*, rather than to preserve the *status quo*, the movant is held to a higher standard of proof. *See, e.g., Bronx Household of Faith v. Board of Educ. of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003). Defendant argues that the plaintiff is seeking such a mandatory injunction and thus must meet a higher standard that requires a "clear or substantial" likelihood of success. *See* DE [22] at 11. The plaintiff argues that it does not seek a mandatory injunction, but rather a prohibitory injunction that will maintain the status quo. DE [24] at 3. The Second Circuit has observed that "the distinction between mandatory and prohibitive injunctions is not without ambiguities or critics," and that determining whether the status quo is to be maintained or upset has led to distinctions that are more semantic than substantive." *Tom Doherty Assocs., Inc. v. Saban Entmt., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) (internal punctuation and citations omitted). Neither party has provided the court with authority that squarely addresses the issue under the circumstances presented here, and I find that this court need not determine whether the relief sought is prohibitory or mandatory, because the plaintiff has failed to establish a likelihood of success even under the lesser standard.

### A. Irreparable Harm

Establishing irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). The Second Circuit has defined irreparable harm "as certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003) (citing *Jayaraj v. Scappini*, 66

F.3d 36, 39 (2d Cir. 1995)); *see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam); *Mountain Information Mgmt., Inc. v. Taddeo*, 455 F. Supp. 2d 124, 132 (E.D.N.Y. 2006) (finding that the movant must show that "irreparable damages are likely, not merely possible"). To demonstrate such harm, a plaintiff must show that "absent a preliminary injunction, they will suffer an injury that is neither remote nor speculative, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). To constitute irreparable harm, an injury must "be one incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

Here, plaintiff contends that it "easily satisfies the irreparable harm component of the preliminary injunction standard" because Gateway's "unlawful UCC-1 filing has threatened [its] very existence, and without the emergency relief sought herein, [plaintiff] is likely to go out of business." Mem. in Support at 9. In some circumstances, "[a] threat to the continued existence of a business can constitute irreparable harm." *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 28-29 (2d Cir. 1978) (citation omitted). In this case, however, I find that Reign Blue's evidence in support of this contention is sorely lacking and its argument that the UCC-1 filing will force it out of business is, at best, speculative. Although it is temporarily unable to conduct business with Ross, Reign Blue has not established that it will be unable to resume that relationship once this litigation is concluded. To the contrary, Nadelman testified that if the UCC-1 statement is dropped, he would see no problem brokering future deals between Ross and Reign Blue (Tr. 90), and he did not suggest that there was a time limitation to this resumption of dealings. Furthermore, other than Mr. Yoon's self-serving testimony, Plaintiff has

provided no evidence that its financing arm, Michelle, has refused to continue funding Plaintiff's operation absent a termination of the UCC-1.

Additionally, Reign Blue has presented little evidence of impact on the business other than the loss of one employee, who may or may not have been working for SB Max as well. Yoon stated that "I'm losing very qualified and good employees," but only identified a secretary, Kim Young Joo, who quit at some undefined time. Tr. 51. When asked if she also worked for SB Max, Yoon responded, "I don't know." Tr. 71. The only other employees mentioned were Joon Kim, who is located in Guatemala and checks the product after manufacture, Tr. 54-55, and warehouse help that comes from a shipping and handling agency when needed and who is paid on a per package basis. Tr. 72. Indeed, Yoon testified that currently he has no employees. Tr. 71. Thus, Reign Blue neither argues nor proves that it is in danger of losing highly skilled or otherwise irreplaceable employees. Beyond the question of Reign Blue's employees, plaintiff has failed to provide any evidence that the business is under any immediate duress such as the threat of eviction from its office space. When asked whether he was able to make rent payments to SB Max, Yoon responded that "[i]t's very difficult." Tr. 51. Reign Blue has not identified any creditors or bills that will go unpaid.

Plaintiff's difficulty in establishing, through evidence, how its business will be destroyed raises the question of whether Reign Blue is, or ever was, a viable business entity. Is its existence truly threatened or is it actually the successor in interest to SB Max, as Gateway claims? Defendant has presented evidence that Beltlan was the parent company of SB Max, and that SB Max and Reign Blue were nearly indistinguishable in terms of corporate formation, incorporating attorney, address of incorporation, and address of office space. Tr. 129; Def. Ex. C

13

& D.  Indeed, the sign at the office location makes the two companies appear indistinguishable. Def. Ex. F.  Plaintiff conducted one transaction from the date of its incorporation to the time it received the transferred purchase orders from Ross.  Pl. Ex. 8.  Additionally, Gary Nadelman testified that Beltlan recommended Reign Blue's services after SB Max, Beltlan's subsidiary company, was unable to fulfill Ross's purchase orders.  Tr. 83.  Thus, it appears that Reign Blue's entire business was built off the back of SB Max's disappearance.  As will be discussed further *infra,* from the evidence presented to this court, it is just as likely as not that Reign Blue is a successor in interest to SB Max.  Since the question of Reign Blue's independent viability is very much in question, the loss of its "business" cannot form the basis for a finding of irreparable harm.

Moreover, the cases cited by Reign Blue in support of its claim that the threat to its business constitutes irreparable harm are distinguishable from the facts presented here.  *See Register.com, Inc. v. Verio*, *Inc.*, 356 F.3d 393 (2d Cir. 2004); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999); *John B. Hull, Inc.*, 588 F.2d 24.  Plaintiffs in those cases presented clear evidence to the court of well-established businesses that were being threatened by the actions of the defendants.  As stated above, I find that Reign Blue was not a well-established business entity and, from the evidence presented, its claim that its existence is being threatened is speculative at best.

Having found that Plaintiff has failed to present sufficient evidence that it will go out of business if the UCC-1 is not terminated, the only damages remaining in this case are the monies held by Ross.  As monetary damages are clearly not a basis for a showing of irreparable harm, Plaintiff's request for injunctive relief must fail.

B.   **Likelihood of Success on the Merits**

Even if plaintiff had been able to establish irreparable harm in the absence of an injunction, it has failed to demonstrate that it would likely succeed on the merits of its claims.

Reign Blue claims that Gateway's filing of the UCC-1 was unauthorized because Reign Blue had no relationship with Gateway. Gateway states that by the terms of its Factoring Agreement with SB Max, Gateway had a security interest in SB Max's assets. The agreement further provides that in the event SB Max forms a new entity during the term of the agreement, "such entity shall be deemed to have expressly assumed the obligations" due to Gateway by SB Max under the agreement. Master Purchase & Sales Agreement, ¶23(c), Def. Ex. J. Thus, Gateway argues, since Reign Blue is a successor entity to SB Max, Gateway's filing of the UCC-1 was authorized. *See also* U.C.C. Art. 9-509 (b) and (c). Based on the arguments presented by the parties, it is clear that this case will turn on whether Reign Blue is a successor entity to SB Max. Although more facts will undoubtedly emerge after discovery, the evidence presented to date does not demonstrate that Reign Blue is likely to prevail on the merits.

Defendant has provided ample evidence suggesting a connection between Reign Blue and SB Max and its parent corporation, Beltlan. As discussed *supra,* Reign Blue's connection to SB Max dates back to its very inception. The two companies shared corporate addresses; their incorporator was the same; the Certificates of Incorporation are nearly identical; and their business pursuits are the same. Tr. 129; Def Ex. C & D. A year later, they shared office space, a telephone number and an email address. Although Nadelman testified that in his experience, it is not unusual for Korean companies to share office space or expenses, Tr. 85-86, plaintiff has provided no evidence, other than Yoon's testimony, to refute the conclusion compelled by factual

15

similarities and the single, integrated sign above the door at the Hicksville office: that Reign Blue is a successor entity to SB Max, set up to provide cover for the parent company Sewon Beltlan, S.A. That sign not only indicates that the offices belong to both SB Max and Reign Blue, but, as noted, provides a single telephone number and internet address for both companies.

In addition to these details, a number of occurrences indicate a connection between the two companies. When SB Max suddenly proved unable, or perhaps unwilling, to satisfy its obligations under the Ross purchase orders, its parent company, Beltlan, suggested that Reign Blue be called. Reign Blue, a company that had existed in name only for over a year, was almost instantly able to obtain financing and take over. Prior to this, Reign Blue had handled one sale as evidenced solely by an invoice to BNS & Partners, an invoice that does not even include the name of a contact person. At the same time, SB Max and its principals apparently disappeared.

The evidence provided by Reign Blue is largely conclusory and in some instances, raises more questions than it answers. Yoon supposedly spent a year searching Asia for appropriate factories, yet somehow ended up in Central America at a factory run by Beltlan, the parent company to SB Max. There is no evidence describing how this came to pass, nor is there proof of Yoon's travels or persuasive details about Reign Blue's relationship with the financing company Michelle.

The final factor militating against a finding that Reign Blue is a separate entity from SB Max is the testimony from Yoon regarding the day to day operations of his company. Yoon is the President of Reign Blue and was unable to identify additional employees of the company beyond a secretary, temporary warehouse worker, and a quality control person in Guatemala. Despite the existence of any appreciable staff, Yoon was unable to answer questions regarding

the ordering process, claiming that he does not do "that kind of work," but rather arranges the finances. Tr. 58. "I'm not myself personally fully involved with selling and purchasing the products. What my role is to pull funding from not this country but a different country, bring the funding to this country, purchase the product manufactured in other countries, and selling it to this country. I am doing that work. I'm not involved in the details of that process." Tr. 63. In addition, he was unable to identify item details on invoice. Tr. 66-67. I find this testimony fundamentally inconsistent with Yoon's contention that he runs Reign Blue as an independent, viable business.

Based on the evidence submitted to date, I find that Reign Blue has failed to demonstrate that it will likely be able to prove that it is not a successor entity to SB Max and as such, has failed to prove its likelihood of success on the merits.

### C. Balance of Hardships

In the absence of a showing of likelihood of success on the merits, Reign Blue must demonstrate that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward it. Even if plaintiff were able to establish irreparable harm, it cannot meet its burden in this prong of the test because I find that Plaintiff cannot establish that the balance of hardships weighs decidedly in its favor. As stated *supra*, I have found that Reign Blue has failed to satisfactorily show that it is not a successor entity to SB Max, and therefore its claimed hardship, that it is being forced out of business by Gateway's UCC-1 filing, is speculative at best. Moreover, the parties stand to lose equally from a monetary standpoint, as Defendant would lose the benefits of its contract with SB Max and plaintiff would lose its purchase orders with Ross. As such, plaintiff has failed to prove

17

that the balance of hardships tips decidedly in its favor.

## CONCLUSION

For the reasons stated herein, I respectfully recommend that plaintiff's motion for preliminary injunction be DENIED.

## OBJECTIONS

A copy of this Report and Recommendation is being sent to counsel by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. §636 (b)(1); Fed. R. Civ. P. 72; Fed. R. Civ. P. 6(a) and 6(d). Failure to file objections within this period waives the right to appeal the District Court's Order. *See Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008); *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003).

Dated: Central Islip, New York
August 27, 2013

/s/ William D. Wall
WILLIAM D. WALL
United States Magistrate Judge